IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | |
|---|---|
| ADAM ARTHUR, COLLEEN ARTHUR, § | |
| § | |
| *Plaintiffs,* § | SA-21-CV-00602-FB |
| § | |
| vs. § | |
| § | |
| LIBERTY MUTUAL PERSONAL § | |
| INSURANCE COMPANY, § | |
| § | |
| *Defendant.* § | |

**REPORT AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE**

**To the Honorable United States District Judge Fred Biery:**

This Report and Recommendation concerns Defendant Liberty Mutual Personal Insurance Company's Motion for Summary Judgment [#20]. All dispositive pretrial matters in this case have been referred to the undersigned for disposition pursuant to Western District of Texas Local Rule CV-72 and Appendix C [#4]. The undersigned therefore has authority to enter this recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). For the reasons set forth below, it is recommended that Defendant's motion be **granted in part and denied in part**.

**I. Background**

This is an insurance dispute concerning the denial of a claim related to hail damage to a metal roof in May 2020. Plaintiffs Adam Arthur and Colleen Arthur are the owners of a home-insurance policy ("the Policy") issued by Defendant Liberty Mutual Insurance Company (hereinafter "Liberty"). Plaintiffs filed this action in state court, alleging Liberty wrongfully denied their claim, concluding that the alleged damage fell under the Policy's exclusion for cosmetic damage. (Orig. Pet. [#1-2], at 6–7.) Plaintiffs contend that in doing so Liberty

1

breached the terms of the Policy, violated Chapters 541 and 542 of the Texas Insurance Code, and breached the duty of good faith and fair dealing. (*Id.* at 9–12.) Liberty removed this case from state court on the basis of diversity jurisdiction.

After conducting discovery, Liberty moved for summary judgment. Liberty argues that Plaintiffs lack any evidence to support their breach of contract claim, which means that Plaintiffs' extracontractual claims also fail as a matter of law. Alternatively, Liberty argues that even if there is a genuine issue of material fact as to breach of contract, it is entitled to summary judgment on Plaintiffs' extracontractual claims because the parties' dispute consists of nothing more than a bona fide dispute as to coverage and scope of damages. Liberty also argues that it is entitled to summary judgment on Plaintiffs' claim for treble damages because there is no evidence that Defendant acted in bad faith and with malice.

## II.  Summary Judgment Standard

Summary judgment is appropriate under Rule 56 of the Federal Rules of Civil Procedure only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also* Fed. R. Civ. P. 56(c). A dispute is genuine only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The party moving for summary judgment bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp.*, 477 U.S. at 323. Once the movant carries its burden, the burden shifts to the nonmoving party to establish

the existence of a genuine issue for trial. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Wise v. E.I. Dupont de Nemours & Co.*, 58 F.3d 193, 195 (5th Cir. 1995). The non-movant must respond to the motion by setting forth particular facts indicating that there is a genuine issue for trial. *Miss. River Basin Alliance v. Westphal*, 230 F.3d 170, 174 (5th Cir. 2000). The parties may satisfy their respective burdens by tendering depositions, affidavits, and other competent evidence. *Topalian v. Ehrman*, 954 F.2d 1125, 1131 (5th Cir. 1992). The Court will view the summary judgment evidence in the light most favorable to the non-movant. *Rosado v. Deters*, 5 F.3d 119, 123 (5th Cir. 1993). "After the non-movant has been given the opportunity to raise a genuine factual issue, if no reasonable juror could find for the non-movant, summary judgment will be granted." *Westphal*, 230 F.3d at 174.

### III.  Summary Judgment Record

The undisputed summary judgment record establishes the following facts. Liberty issued Policy No. H3V29183959240 to Plaintiffs, insuring their residential property located at 205 Castano Avenue, San Antonio, Texas 78209. (Elizondo Decl. [#20], at 17, ¶ 2.) The Policy contains a cosmetic exclusion, which excludes coverage for cosmetic loss or damage to metal roof materials and provides as follows:

> **Cosmetic loss or damage**, meaning any loss that is limited to the physical appearance of "metal materials" but:
>
> a. does not result in the penetration of water through the "metal materials"; or
>
> b. does not result in the failure of the "metal materials" to perform their intended function of keeping out the elements.
>
> For purposes of this exclusion, "metal materials" means"
>
> a. all metal roofing materials that are part of the dwelling; or
>
> b. all "metal materials" that are part of an other structure.

> This exclusion does not apply to non-roof "metal materials" that are primarily decorative, prominent and visible from the ground.

(Policy [#20], at 64.)   The Policy also specifies that Liberty will not pay for the cost to replace roof surfacing because of:

> a. wear and tear, marring, scratching or deterioration;
>
> b. fading, weathering, oxidizing or color;
>
> c. texture or dimensional differences;
>
> d. obsolescence or unavailability of materials; or
>
> e. inherent vice, latent defect, mechanical breakdown.

(*Id.* at 68.)

On May 26, 2020, a severe weather event involving hail occurred in Plaintiffs' neighborhood, resulting in the alleged damage to their metal roof. (Storm Report [#20], at 141–42.)  Liberty first received notice of Plaintiffs' claim for damages on May 28, 2020. (Elizondo Decl. [#20], at 17, ¶ 5; Claim File [#20], at 85.)  Claims adjuster Doug Lehr contacted Plaintiffs later that day and scheduled an inspection for June 6, 2020, to determine the cause and extent of storm damage. (Elizondo Decl. [#20], at 17–18, ¶ 5; Claim File [#20], at 85; Correspondence [#20], at 93.)  In his correspondence, Mr. Lehr advised Plaintiffs of the cosmetic exclusion to the Policy for metal roofing. (Elizondo Decl. [#20], at 18, ¶ 5; Claim File [#20], at 85.)

Plaintiffs requested that the inspection be rescheduled, and an inspector with Ladder Now inspected Plaintiffs' property on June 15, 2020. (Elizondo Decl. [#20], at 18, ¶ 7; Claim File [#20], at 84–85; Correspondence [#20], at 95; Ladder Now Report [#20], at 87–91.)  On June 22, 2020, Mr. Lehr left a message for Plaintiffs to discuss the findings. (Elizondo Decl. [#20], at 19, ¶ 8; Claim File [#20], at 84.)  The report by Ladder Now's inspector documented findings of hail

damage on the front and back slopes of the metal roof and to the roof accessories and included photographs of the various roof faces, seams, gutters, and chimney but did not reach any specific conclusions about coverage under the Policy.  (Ladder Now Report [#23-5], at 9–35.)

On June 25, 2020, Liberty received notice that Plaintiffs had hired Logan Rodgers to act as their public adjuster and that Rodgers believed the hail damage was not merely cosmetic. (Elizondo Decl. [#20], at 19, ¶ 9; Claim File [#20], at 84.)  In response, Liberty retained an engineer with Rimkus Consulting to further inspect the roof for structural damage.  (Elizondo Decl. [#20], at 19, ¶ 9; Claim File [#20], at 84.)  Marvin Miller, a Rimkus engineer, conducted a first inspection on July 17, 2020, but no report was ever generated because Mr. Miller separated employment with Rimkus prior to completing the project.  (Rimkus Report [#20], at 103.) However, photographs from Mr. Miller's inspection were retained by Liberty in its records.  (*Id.*)

Ezequiel Ocanas performed a second inspection of the property for Rimkus on August 21, 2020, and issued a report on August 27, 2020.  (*Id.* at 104, 106; Claim File [#20], at 83.)  The report found that hail from a recent storm event had caused approximately 40 "maximum-sized circular dents of 1 inch on the metal roof panels" of Plaintiffs' residence.  (Rimkus Report [#20], at 104, 106.)  However, "close examination" of the hail damage indicated that "the impacts did not chip or scratch the protective coating of the metal roof panels at the circular dents," and "the panel seams had not been distorted or separated by hail impacts to affect the water-shedding ability or the fastening strength of the panels."  (*Id.* at 109.)  The report reasoned that "[d]ue to the solid backing provided by the underlying roof sheathing, the load-carrying capacity of the roof slopes remained unaffected."  (*Id.*)  Additionally, the report documented that Mr. Ocanas inspected select sections of the roof's metal cap flashing, coping, and ridge cap and did not observe any circular dents on these roof materials, leading to the conclusion that the roof had

remained intact and no reduction in functionality was expected. (*Id.*) The report did find some metal panel seam deformations along the roof slope transition between the north-facing roof slopes but concluded these "were mechanical in nature and inconsistent with the effects of hail impact." (*Id.* at 107.) The report's ultimate conclusion was that the "dents observed to the metal roofing . . . were cosmetic in nature and had not affected the water shedding capacity or the long-term serviceability of the roof covering." (*Id.* at 104, 106; Elizondo Decl. [#20], at 19, ¶ 10; Claim File [#20], at 83.)

On August 29, 2020, Liberty sent copies of Rimkus's findings and issued a letter to Plaintiffs addressing the policy exclusion language applicable to metal roofs. (Elizondo Decl. [#20], at 19, ¶ 11.) Liberty denied coverage as to the metal roof based on the cosmetic damage exclusion. (*Id.*) Plaintiffs filed suit on April 19, 2021. (Orig. Pet. [#1-2], at 5.)

## IV.  Analysis

Liberty seeks summary judgment on Plaintiffs' breach of contract claim, all extracontractual claims, and Plaintiffs' claims for treble and exemplary damages. The Court should deny Liberty's motion for summary judgment as to Plaintiffs' breach of contract claim but grant the motion as to all extracontractual claims. Because Plaintiffs' extracontractual claims fail as a matter of law, Plaintiffs also cannot pursue their claims for treble and exemplary damages.

**A.     Breach of Contract**

Plaintiffs' Original Petition asserts a cause of action for breach of contract, which alleges that Liberty breached the Policy by refusing to pay compensation due under the Policy's terms. Texas law governs Plaintiffs' breach of contract claim because this case arises under the Court's diversity jurisdiction. *Austin v. Kroger Tex. L.P.*, 746 F.3d 191, 196 (5th Cir. 2014) (per

curiam).  Under Texas law, insurance policies are contracts that establish the respective rights and obligations to which an insurer and its insured have mutually agreed.  *USAA Tex. Lloyds Co. v. Menchaca*, 545 S.W.3d 479, 488 (Tex. 2018).  Texas courts construe insurance policies using the same rules that govern the construction of any contract.  *Id.*

The primary concern of a court in construing a written contract is to ascertain the true intent of the parties as expressed in the instrument and to ensure contract terms are construed according to "the ordinary, everyday meaning of the words to the general public."  *Exxon Mobil Corp. v. Ins. Co. of State*, 568 S.W.3d 650, 657 (Tex. 2019) (quoting *Progressive Cty. Mut. Ins. Co. v. Sink*, 107 S.W.3d 547, 551 (Tex. 2003)).  The most important consideration in interpreting the meaning of a contract is "the agreement's plain, grammatical language."  *Endeavor Energy Res., L.P. v. Energen Res. Corp.*, 615 S.W.3d 144, 148 (Tex. 2020).  To that end, the terms used in the policy are given their plain, ordinary meaning unless the policy itself shows that the parties intended the terms to have a different, technical meaning.  *Exxon Mobil Corp.*, 568 S.W.3d at 657.  Context is important, and this Court must examine the entire writing and endeavor to harmonize and give effect to all the provisions so that none are rendered meaningless.  *Id.*

An insured bears the initial burden of establishing coverage under the terms of the policy. *Gilbert Tex. Const., L.P. v. Underwriters at Lloyd's London*, 327 S.W.3d 118, 124 (Tex. 2010). If the insured proves coverage, then to avoid liability the insurer must prove the loss is within an exclusion.  *Id.*  If the insurer proves that an exclusion applies, the burden shifts back to the insured to show that an exception to the exclusion brings the claim back within coverage.  *Id.*

The parties do not dispute that Plaintiffs' sustained hail damage to their metal roof during the May 26, 2020 storm event.  Both Plaintiffs' public adjuster, Logan Rodgers, and Liberty's engineers (both with Ladder Now and Rimkus Consulting) concluded that a recent storm event

had caused hail dents on Plaintiffs' roof.[1]  (Ladder Now Report [#23-5], at 9–35; Claim File [#20], at 84; Rimkus Report [#20], at 104, 106.)  The question before the Court is whether Liberty has established as a matter of law that the Policy's cosmetic exclusion applies to the damage, such that Plaintiffs are not entitled to coverage.  Liberty has not.

The Policy's cosmetic exclusion applies to "metal roofing materials."  (Policy [#20], at 64.)  The Policy excludes "cosmetic loss or damage," which is defined as "any loss that is limited to the physical appearance" of the roof and does not result in (a) "the penetration of water through the 'metal materials'" or (b) "the failure of the 'metal materials' to perform their intended function of keeping out the elements.'"  (*Id.*)  The summary judgment record forecloses any argument by Plaintiffs that water penetrated through their roof due to the hail damage.  Plaintiff Adam Arthur testified that Plaintiffs did not have any interior leaking as a result of the storm.   (Arthur Dep. [#20], at 228.)   Mr. Rodgers, Plaintiffs' public adjuster, testified consistently in his deposition—that there had not been any interior leaking to the property since the May 2020 storm event.  (Rodgers Dep. [#20], at 246.)  Plaintiffs' designated expert on cause and origin of roof damage, engineer John McIntyre, also confirmed in his deposition that there was no interior leaking readily visible in the interior of the house.  (McIntyre Dep. [#20], at 238.)  Plaintiffs' summary judgment response clarifies that the parties' dispute centers on the prong of

---

[1] The undersigned notes that the summary judgment record contains a letter from Alan Berryhill, one of Liberty's experts, which calls into question the conclusion that the May 2020 storm event caused the hail dents on Plaintiffs' roof, as there were eight other storm events from January 1, 2009, to February 28, 2022.  (Berryhill Ltr. [#20], at 187.)  Yet Liberty documented in the claim file that Plaintiffs' roof was only one year old at the time of the storm, and Liberty's adjusters attributed the hail damage to the May 2020 storm, as noted *infra*.  (Claim File [#20], at 85.)  If Liberty is indeed disputing whether the May 2020 storm caused hail damage to Plaintiffs' room, there is more than ample evidence from which a reasonable factfinder could conclude otherwise, and this is not a separate basis for awarding summary judgment to Liberty.

the cosmetic exclusion pertaining to functional damage of the roof, not the prong related to water penetration. (Resp. [#23], at 7.)

The undersigned agrees with Plaintiffs that the summary judgment record presents a genuine dispute of material fact as to whether the hail damage at issue caused "the failure of the 'metal materials' to perform their intended function of keeping out the elements.'" (Policy [#20], at 64.) The claim file indicates that Plaintiffs' public adjuster, Mr. Rodgers, did not believe the hail damage to be merely cosmetic. (Claim File [#20], at 84.) Rodgers testified in his deposition that during his inspection of the roof, he identified hail damage to the roof seams, not just the roof panels. (Rodgers Dep. [#24-2], at 35:2–23.) Additionally, Plaintiffs have offered the expert report of their engineer, Mr. McIntyre, who inspected the roof in December 2021 and produced a report regarding "obvious hail strikes" to the roof seams in addition to roof faces, in which he concluded that hail damage had breached the finish on the standing seam. (McIntyre Report [#23-2], at 6.) Although Mr. McIntyre acknowledge in his deposition that the roof appeared to be shedding water, he believed that the "surface splatters" and "surface breaches" are going "to reduce the lifetime of the roof." (McIntyre Dep. [#20], at 239.) As a result of the damages to the roof seams, Mr. McIntyre concluded that the roof is in "functional failure" and "no longer provides the intended protection to the remainder of the structure." (McIntyre Report [#23-2], at 7.)

Liberty disputes that any damage to the roof seams was the result of hail and disputes that this damage affects the roof's ability to perform its intended function. The inspection by Ezequiel Ocanas of Rimkus Consulting in August 2020 documented some seam deformations on the slope transition between the north-facing roof slopes but concluded the damage was "mechanical in nature and inconsistent with the effects of hail impact." (Rimkus Report [#20], at

107.) Additionally, Mr. Ocanas observed that the roof seams had not been distorted or separated by hail impacts, such that the damages would affect the water-shedding ability or fastening strength of the panels. (*Id.* at 109.) Liberty's designated expert engineer, Jordan Beckner, who inspected Plaintiffs' roof in March 2021, also observed damage to the roof seams, but he similarly concluded the damage was not from hail; rather, he found the seam damage to be caused by sporadic scrapes and sharp dents more consistent with impacts from tools or other hard objects, as well as mechanical distortions of the seams. (Beckner Report [#20], at 210.)

Both Mr. Beckner and Mr. Ocanas also concluded that the hail dents to the roof face did not disrupt the protective coating of the roof and did not cause any functional damage to the roof's water-shedding ability or expected service life. (*Id.*; Rimkus Report [#20], at 104, 106.) Plaintiffs' expert Mr. McIntyre, in contrast, observed breached finish of the roof panels at multiple hail strike locations. (McIntyre Report [#23-2], at 6–7.) Photographs of various hail dents on the north roof in Mr. McIntyre's report document these alleged breaches, which he believes have affected the ability of the roof to provide its intended protection to the remainder of the structure. (*Id.* at 13.)

In summary, the parties' engineers disagree as to whether the roof has sustained more than mere cosmetic damage. Whether hail strikes to the roof face breached the roof finish and whether damage to the roof seams was caused by hail or some other mechanical defect are both relevant to the resolution of Liberty's assertion that the cosmetic exclusion applies, and they are both fact questions for the jury. Liberty has not met its burden to establish as a matter of law that the exclusion applies.

Liberty makes much of Mr. McIntyre's testimony that it would be speculative to estimate the depreciation of the life of Plaintiffs' roof based on the hail damage. (McIntyre Dep. [#20], at

103:3–10.)  The fact that Mr. McIntyre could not estimate the precise depreciation of the life of Plaintiffs' roof does not undermine the genuine dispute at issue here—whether the damage to the roof is limited to its purely physical appearance or whether the damage resulted in a failure of the roof to perform its intended function to keep out the elements.

Finally, the undersigned disagrees with Liberty that to defeat its motion for summary judgment Plaintiffs must present evidence that the roof is unable to "keep the elements out from the interior."  Liberty bears the burden to prove the cosmetic exclusion applies as a matter of law.  Therefore, Liberty must establish that there is no genuine dispute of material fact as to whether the hail damage to Plaintiffs' roof resulted in the failure of the roof to perform its intended function of keeping out the elements.  As previously discussed, Plaintiffs have presented evidence from their public adjuster and expert engineer that the damage to the roof is not merely cosmetic but has affected the roof's function.  Plaintiffs do not need to present evidence of active water intrusion to raise a fact issue on this question.

Because Liberty has not established as a matter of law that the hail damage to Plaintiffs' roof is limited to cosmetic loss and damage, the Court should deny Liberty's motion for summary judgment as to Plaintiffs' breach of contract claim.

**B.     Extracontractual Claims**

In addition to their breach of contract claim, Plaintiffs plead that Liberty violated the Texas Insurance Code and breached its the duty of good faith and fair dealing. Plaintiffs allege that Liberty misrepresented material facts related to the coverage at issue; failed to effectuate a prompt, fair, and equitable settlement; and failed to conduct a reasonable investigation in violation of Chapter 541 of the Texas Insurance Code.  (Orig. Pet. [#1-2], at 9–10.)  Plaintiffs also assert a cause of action under the Texas Prompt Payment of Claims Act pursuant to Chapter

542 of the Texas Insurance Code, alleging Liberty failed to timely acknowledge receipt of their claim and commence investigation of their claim. (*Id.* at 10.) Finally, Plaintiffs contend Liberty engaged in false, deceptive, and misleading acts or practices in violation of the Texas Deceptive Trade Practices Act ("DTPA") and breached the common law duty of good faith and fair dealing by failing to settle the entire claim. (*Id.* at 11–12.)

Plaintiffs' extracontractual claims are based on their contentions that Liberty conducted an unreasonable investigation, delayed and improperly settled their claim, and misrepresented material facts related to the Policy. Liberty asks the Court to award it summary judgment on all of Plaintiffs' extracontractual claims on the basis that Plaintiffs have failed to produce any evidence of bad faith and that this case amounts to no more than a bona fide dispute between the parties' engineers as to coverage. The undersigned agrees with Liberty. Plaintiffs have failed to raise a genuine dispute of material fact on any of their assertions related to their extracontractual claims.

    **i.**    **There is no genuine dispute of material fact as to delay in processing Plaintiffs' claim.**

First, there is no genuine fact dispute as to any delay in the settlement of Plaintiffs' claim that could constitute a violation of the Prompt Payment of Claims Act ("TPPCA") under Chapter 542. Section 542.055, which governs receipt of notice of a claim, provides that insurers must acknowledge receipt of and commence investigation of a claim no later than the 15th day after receiving notice of the claim. Tex. Ins. Code § 542.055(a). Additional TPPCA deadlines are triggered when "the insurer receives all items, statements, and forms required . . . to secure final proof of loss," whether the insurer receives this information in response to its initial request or in response to additional requests. *Id.* at § 542.056(a). If an insurer rejects a claim, its notice must state the insurer's reasons. *Id.* § 542.056(c).

The summary judgment record establishes that Liberty contacted Plaintiffs the same day they reported the hail event and alleged damage to their roof.  (Elizondo Decl. [#20], at 17–18, ¶ 5; Claim File [#20], at 85; Correspondence [#20], at 93.)  Liberty scheduled an inspection within approximately one week of receiving notice of the claim (within the 15 days allowed under the TPPCA), but Plaintiffs requested the inspection be rescheduled for the following week.  (Elizondo Decl. [#20], at 18, ¶ 7; Claim File [#20], at 84–85; Correspondence [#20], at 95; Ladder Now Report [#20], at 87–91.)

After Liberty received notice that Plaintiffs had hired a public adjuster approximately two weeks later in late June, Liberty scheduled a second inspection, which Mr. Miller performed in mid-July.  (Rimkus Report [#20], at 103.)  There was a slight delay in the production of the report for this inspection because Mr. Miller separated his employment with Rimkus Consulting and the inspection had to be redone on August 21, 2020, by Mr. Ocanas.  (*Id.* at 104, 106.)  Mr. Ocanas produced his report less than one week later, and Liberty denied coverage based on the report's findings several days later.  (Elizondo Decl. [#20], at 19, ¶ 11; Claim File [#20], at 83.)

Plaintiffs' summary judgment response does not identify any summary judgment evidence related to the alleged delay in processing their insurance claim or argue how Liberty violated the TPPCA and Chapter 542 of the Texas Insurance Code.  Accordingly, Liberty is entitled to summary judgment as a matter of law on this extracontractual claim.

> **ii.** **There is no genuine dispute of material fact as to the reasonableness of the investigation of Plaintiffs' claim and Liberty's bad faith.**

"Under Texas law, extracontractual tort claims pursuant to the Texas Insurance Code and the DTPA require the same predicate for recovery as bad faith causes of action."  *Watson v. State Farm Lloyds*, 56 F. Supp. 2d 734, 736 (N.D. Tex. 1999) (internal quotation omitted) (citing *Higginbotham v. State Farm Mut. Auto. Ins. Co.*, 103 F.3d 456, 460 (5th Cir. 1997)).  Texas law

13

Case 5:21-cv-00602-FB-ESC   Document 31   Filed 12/20/22   Page 14 of 19

imposes "a duty on the part of the insurer to deal fairly and in good faith with an insured in the processing of claims." *Higginbotham*, 103 F.3d at 459 (citation omitted).  To prove that an insurer acted in bad faith in violation of Texas common law, an insured must show that the insurer failed to settle the claim even though it "knew or should have known that it was reasonably clear that the claim was covered." *Universe Life Ins. Co. v. Giles*, 950 S.W.2d 48, 49 (Tex. 1997).

The "reasonably clear" standard found in the Insurance Code and common law standard for what constitutes bad faith is the same. *Id.* at 55.  "[T]he issue of bad faith does not focus on whether the claim was valid, but on the reasonableness of the insurer's conduct in rejecting the claim." *Lyons v. Miller Cas. Ins. Co.*, 866 S.W.2d 597, 601 (Tex. 1993).  Texas courts have repeatedly held that "evidence showing only a bona fide coverage dispute does not, standing alone, demonstrate bad faith." *State Farm Lloyds v. Nicolau*, 951 S.W.2d 444, 448 (Tex. 1997).  If an insurer fails to conduct a reasonable investigation, it cannot assert that a bona fide coverage dispute exists. *State Farm Fire & Cas. Co. v. Simmons*, 963 S.W.2d 42, 44 (Tex. 1998).  Reasonableness is determined using an objective standard of whether a reasonable insurer under similar circumstances would have delayed or denied payment of the claim. *Aranda v. Insurance Co. of N. Am.*, 748 S.W.2d 210, 213 (Tex. 1988), *overruled on other grounds by Tex. Mut. Ins. Co. v. Ruttiger*, 381 S.W.3d 430 (Tex. 2012).

"The scope of the appropriate investigation will vary with the claim's nature and value and the complexity of the factual issues involved." *Simmons*, 963 S.W.2d at 44–45.  "An insurer does not act in bad faith where a reasonable investigation reveals the claim is questionable." *United Servs. Auto. Ass'n v. Croft*, 175 S.W.3d 457, 471 (Tex. App.—Dallas 2005, no pet.).  Importantly, an insurer's reliance on an expert's report will not support a finding of bad faith

14

unless "there is evidence that the report was not objectively prepared or the insurer's reliance on the report was unreasonable." *State Farm Lloyds v. Nicolau*, 951 S.W.2d 444, 448 (Tex. 1997). In contrast, an insurer fails to reasonably investigate a claim if the investigation is conducted as a pretext for denying the claim. *See, e.g.*, *Simmons*, 963 S.W.2d at 45 (finding an "outcome-oriented" investigation unreasonable); *Nicolau*, 951 S.W2d at 448 (finding that where there is evidence that an expert's report was not objectively prepared, summary judgement is not appropriate).

The summary judgment record establishes that Liberty made its coverage decision on Plaintiffs' claim based on recommendations made by Mr. Lehr, the adjuster who handled and investigated Plaintiffs' claims on behalf of Liberty, and the report from the engineer with Rimkus, retained by Liberty to evaluate the damage to Plaintiffs' roof. There is no credible evidence to suggest that either Lehr or Rimkus conducted an unreasonable investigation, or that the investigation was calculated to underpay Plaintiffs' claim. And, importantly, Liberty's expert engineer, Jordan Beckner, agreed with Lehr and Rimkus's findings.

The only arguments regarding bad faith in Plaintiffs' response to Liberty's motion center on the initial determination by Mr. Lehr based on the inspection by Ladder Now. Plaintiffs argue that Mr. Lehr initially denied Plaintiffs' claim without conducting an inspection himself and instead relied on photos submitted by the inspector for Ladder Now. Plaintiffs also argue that Ladder Now's inspector did not inspect the interior of the property. Neither of these arguments are sufficient to defeat Liberty's motion. As previously noted, the undisputed evidence confirms that there was never any interior water damage to Plaintiffs' property; thus, there can be no bad faith in the failure of Ladder's Now's inspector or Mr. Lehr in not pursuing an interior inspection. Nor is there any basis for a finding that Liberty's decision to employ a contractor to

15

photograph and inspect the claim constitutes bad faith. Finally, the record does not demonstrate that Liberty issued a claim denial based solely on review of the Ladder Now report. Rather, Liberty waited to issue a decision letter until after the inspection and a report was generated by Rimkus. (Claim File [#20], at 83–84.)

In summary, there is no evidence in the record to support Plaintiffs' general allegations of an unreasonable investigation, such as pretext or an outcome-oriented investigation. Because Plaintiffs have not put forth any evidence that would show that Liberty acted unreasonably in handling Plaintiffs' claims, Plaintiffs' claims for bad faith and for violations the Texas Insurance Code fail as a matter of law.

### iii. There is no genuine dispute of material fact as to any misrepresentations by Liberty as to the scope of coverage.

The Texas Insurance Code also permits an insured to bring a cause of action through its tie-in provision, Tex. Ins. Code § 541.151(2), for deceptive acts or practices enumerated in Section 17.46(b) of the DTPA. Tex. Bus. & Comm. Code § 17.46(b). A DTPA plaintiff must prove, among other things, that the defendant engaged in false, misleading, or deceptive acts. *Doe v. Boys Clubs of Greater Dallas*, 907 S.W.2d 472, 478 (Tex. 1995); *see also* Tex. Bus. & Comm. Code § 17.50(a)(1).

Insofar as Plaintiffs are attempting to assert a misrepresentation made during the sale of the Policy, no such allegations appear in their Petition. Nor have they provided any evidence of specific representations by Liberty or its employees as to the scope of coverage aside from the undisputed evidence as to the findings and estimates resulting from the various inspections. As to any post-loss misrepresentation regarding the scope of coverage, Plaintiffs similarly do not provide any evidence that any representative of Liberty made any affirmative representations regarding the Policy's application as to hail damage. And even if Plaintiffs did have evidence of

such representations, they would not be actionable under the DTPA, because Plaintiffs have done nothing in reliance on post-loss representations. *See Amstadt v. U.S. Brass Corp.*, 919 S.W.2d 644, 649 (defendant's misrepresentations must be a producing cause of plaintiff's injuries).

In summary, Plaintiffs' extracontractual claims do not raise any fact issue as to any unreasonable or bad faith conduct outside of the denial of their claim. Plaintiffs' allegations are simply that they believe they should have been afforded coverage under the Policy due to the scope and extent of the hail damage. This is a bona fide coverage dispute, not a separate violation under common law, the DTPA, or other provisions of the Texas Insurance Code. Plaintiffs therefore cannot prevail on any extracontractual claim based upon an unreasonable settlement of their insurance claim.

## C.     Treble and Exemplary Damages

The Court should also grant Liberty summary judgment on its claims for treble and exemplary damages. Treble damages are only available under the DTPA and Chapter 541 of the Texas Insurance Code. *See* Tex. Ins. Code § 541.152(b) (providing for treble damages where trier of fact finds that defendant knowingly committed statutory violation); Tex. Bus. & Comm. Code § 17.50(b)(1) (same). Because Plaintiffs cannot prove violations of Chapter 541 or the DTPA, it necessarily follows that they are not entitled to treble damages flowing from these claims. Texas law compels the same conclusion as to Plaintiffs' claim for exemplary damages, as these damages are not recoverable for a breach of contract, even one breached maliciously. *See Jim Walter Homes, Inc. v. Reed*, 711 S.W.2d 617, 618 (Tex. 1986). These damages claim therefore fail as a matter of law.

### V.  Conclusion and Recommendation

Having considered Liberty's motion, the response and reply thereto, the summary judgment record, and governing law, the undersigned **recommends** that Defendant Liberty Mutual Personal Insurance Company's Motion for Summary Judgment [#20] be **GRANTED IN PART AND DENIED IN PART** as follows:

- Liberty should be awarded summary judgment on Plaintiffs' extracontractual claims arising under Chapters 541 and 542 of the Texas Insurance Code and the DTPA and for breach of the duty of good faith and fair dealing.

- Liberty should be awarded summary judgment on Plaintiffs' claims for treble and exemplary damages.

- Plaintiffs' claim for breach of contract should proceed to trial.

### VI.  Instructions for Service and Notice of Right to Object/Appeal

The United States District Clerk shall serve a copy of this report and recommendation on all parties by either (1) electronic transmittal to all parties represented by attorneys registered as a "filing user" with the clerk of court, or (2) by mailing a copy to those not registered by certified mail, return receipt requested.  Written objections to this report and recommendation must be filed **within fourteen (14) days** after being served with a copy of same, unless this time period is modified by the district court.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).  The party shall file the objections with the Clerk of Court and serve the objections on all other parties.  A party filing objections must specifically identify those findings, conclusions or recommendations to which objections are being made and the basis for such objections; the district court need not consider frivolous, conclusive or general objections.  A party's failure to file written objections to the proposed findings, conclusions and recommendations contained in this report shall bar the party from a *de novo* determination by the district court.  *Thomas v. Arn*, 474 U.S. 140, 149–52 (1985); *Acuña v. Brown & Root, Inc.,* 200 F.3d 335, 340 (5th Cir. 2000).  Additionally, failure to file

timely written objections to the proposed findings, conclusions and recommendations contained in this report and recommendation shall bar the aggrieved party, except upon grounds of plain error, from attacking on appeal the un-objected-to proposed factual findings and legal conclusions accepted by the district court. *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428–29 (5th Cir. 1996) (en banc).

SIGNED this 20th day of December, 2022.

ELIZABETH S. ("BETSY") CHESTNEY
UNITED STATES MAGISTRATE JUDGE